# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 17-cv-20041-JJO

**ESTHER CRESPO ALEMAN,**

     **Plaintiff,**

**v.**

**NANCY A. BERRYHILL,**
**Acting Commissioner of Social Security**
**Administration,**

     **Defendant.**

_____/

## <u>ORDER</u>

THIS MATTER is before the Court on the Plaintiff's Motion for Summary Judgment and Memorandum in Support Thereof (DE #21, 06/24/2017), and the Defendant's Motion for Summary Judgment and Opposition to Plaintiff's Motion fo Summary Judgment (DE #22, 07/24/2017). The plaintiff requests the final decision of the Commissioner of Social Security be reversed and Disability Benefits ("DB") be granted under Title XVI of the Social Security Act ("SSA"). In the alternative, the plaintiff requests the final decision of the Commissioner of Social Security be remanded under Sentence Four of 42 U.S.C. § 405(a) for further administrative proceedings. The Complaint was filed pursuant to the SSA, 42 U.S.C. § 405(g), and is properly before the Court for judicial review of a final decision of the Commissioner of the SSA. The parties consented to Magistrate Judge jurisdiction, (DE #17, 04/19/2017), and this matter was reassigned to the undersigned pursuant to Judge Altonaga's Order dated April 19, 2017 (DE #19, 04/19/2017). Having carefully considered the filings and applicable law, the undersigned enters the following Order.

## PROCEDURAL HISTORY

On October 16, 2013, Esther Crespo Aleman ("the plaintiff") filed an application for Supplemental Security Income ("SSI"). (Tr. 203-12).[1] The plaintiff's SSI application was initially denied on November 1, 2013, (Tr. 104-106), and was denied again on reconsideration on December 18, 2013. (Tr. 107-111). The plaintiff requested a hearing before an administrative law judge ("ALJ"), which was held on July 13, 2015. (Tr. 47-87). On September 2, 2015, the ALJ denied the plaintiff's SSI application. (Tr. 26-46). The plaintiff filed an appeal to the Appeals Council requesting review of the ALJ's decision. (Tr. 301-09). The Appeals Council denied the plaintiff's request for review on November 7, 2016. (Tr. 1-5). The plaintiff has exhausted her administrative remedies and this case is ripe for review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3). The plaintiff filed a Motion for Summary Judgment on June 24, 2017 (DE #21, 06/24/2017), the defendant filed a response and Cross-Motion for Summary Judgment on July 24, 2017 (DE #22, 07/24/2017), and the plaintiff filed a response to the defendant's Motion for Summary Judgment and reply to the defendant's response on August 28, 2017 (DE #26, 08/28/2017).

## FACTS

### I. Plaintiff's Background and Plaintiff's Hearing Testimony

The plaintiff was born in Cuba on January 25, 1967, (Tr. 196, 203), and has completed school through ninth grade. (Tr. 216). The plaintiff has a limited work history and has only minimal earnings from previously cleaning houses, babysitting, and packing salads at farm markets. (Tr. 54-

---

[1] All references to "Tr." refer to the transcript of the Social Security Administration. Moreover, the page numbers refer to those found on the lower right hand corner of each page of the transcript, as opposed to those assigned by the Court's electronic docketing system or any other page numbers that may appear.

55, 200-202, 299). The plaintiff earned less than $5,000 in the years 2004 and 2009. (Tr. 202). The plaintiff earned less than $9,000 in the year 2005. (*Id.*). The plaintiff has not earned any income since 2009. (*Id.*). Due to thyroid cancer and hypocalcemia,[2] the plaintiff alleges that she has been unable to work since undergoing total thyroidectomy surgery, paratracheal dissection, and paratracheal node dissection in the left neck on September 26, 2013. (Tr. 55-56 , 235, 342).

The plaintiff believes she is unable to work because she experiences numbness on her left side from below her left ear all the way down the left side of her shoulder, her vocal cords are compromised and it takes a great deal of effort to speak, she has numbness in both fingers and hands making it difficult to carry things, she has a bacterial problem in her right eye that causes her to always drop tears, her medication causes adverse side effects, such as having difficulty walking, palpitations, dizziness, and sleepiness, she suffers from depression, and she forgets things. (Tr. 55-57, 67, 69). The plaintiff completed an Application for Supplemental Security Income under Title XVI of the Social Security Act on October 11, 2013. (Tr. 203-13). The plaintiff also completed an Adult Disability Report, Form SSA-3368-BK, on October 11, 2013. (Tr. 214-25).

On July 13, 2015, the plaintiff testified that she lives only with her husband. (Tr. 53). The plaintiff further testified that she is sometimes able to help with housework, such as cooking with the help of her husband and performing household chores, but how much she is able to help depends on how her depression is on a given day and what level of numbness she experiences. (Tr. 67- 68). The plaintiff further testified that her husband needs to help her dress, but that depending on how

---

[2] Hypocalcemia "is caused by loss of calcium from or insufficient entry of calcium into the circulation" and the most common cause of hypocalcemia is hypoparathyroidism, which often develops due to neck surgery for head and neck cancers. Mario Skugar, *Hypocalcemia*, CLEVELAND CLINIC, (May 2014). http://www.clevelandclinicmeded.com/medicalpubs/disease management/endocrinology/hypocalcemia/ (last visited September 20, 2017).

she feels, she will make an effort to dress herself so as not to bother her husband. (Tr. 67). The plaintiff stated that she doesn't go shopping, but later admitted that if her husband goes, she will go with him, but does not like to be outside and requests to go back home. (*Id.*). The plaintiff further testified that although she is unable to lift anything, if her fingers aren't too numb she can lift a dish to wash it or lift a small bottle of milk, but if she is experiencing numbness, she is unable to lift either the dish or the milk. (Tr. 75-76).

The plaintiff indicated that she has psychological impairments and sees a doctor once a month for treatment, which includes prescription medication. (Tr. 69-70). The plaintiff testified that her husband wakes her up in the morning to give her the medication, and once her husband leaves, the plaintiff either sits or lies down and will occasionally nap. (Tr. 66-67). The plaintiff has no hobbies or activities that she likes to do because she doesn't feel like doing anything or going anywhere. (Tr. 68). Other than her husband, the plaintiff testified that she only sees some family, including her mother-in-law, sister-in-law, and sometimes her daughter. (Tr. 70-71). Except for occasionally seeing family, the plaintiff indicates that she sees people if she goes out to the supermarket with her husband. (Tr. 71).

The plaintiff testified that she experiences painful headaches every day, which can last one to two hours, and if she does take medicine, the headaches get better, but ultimately come back. (Tr. 73). Besides significant head pain, the plaintiff testified that she experiences a sharp pinching, needle-like pain throughout her entire body every day and will take medication that helps for four to six hours before the pain comes back. (Tr. 74-75). The plaintiff claims that she has more bad days than good days, is unsure of the amount of time she can spend standing in an eight-hour day, is unsure of the amount of time she can spend sitting, but estimates that she can sit for twenty minutes

to one hour during the course of an eight-hour day. The plaintiff indicated that she hasn't driven since before her surgery on September 26, 2013, and was unable to indicate what portion of her day she spends lying down. (Tr. 76-79).

## II. Medical Treatment History

A.   Jackson Memorial Hospital

In 2011, the plaintiff developed a mass in the left side of her neck. (Tr. 339). Dr. Ronen Nazarian was the plaintiff's physician on August 29, 2013, when the plaintiff had a fine needle aspiration ("FNA") performed on the left neck which suggested papillary carcinoma of the thyroid. (Tr. 402). On September 26, 2013, the plaintiff underwent a total thyroidectomy with neck dissection of lymph nodes on the left side of her neck at Jackson Memorial Hospital ("the surgery"). (Tr. 339, 402). The notes regarding the plaintiff's surgery that were prepared by the plaintiff's attending physician indicate that a nerve traveling down to the trapezius muscle was found entwined with the large neck mass and was severely displaced. (Tr. 367). Because of the nerve's entwinement with the muscle, the nerve was incised. (*Id.*). Following the surgery, the plaintiff remained in the hospital until October 3, 2013 when she was discharged. (Tr. 337).

The plaintiff had a follow-up visit with Dr. Nicholas Craig Purdy, her ear, nose, and throat ("ENT") physician, on October 25, 2013, at which time she was prescribed Calcitriol[3] and Levothyroxine.[4] (Tr. 327). The plaintiff was examined by Dr. Keith Richardson, another ENT

---

[3] Calcitriol is used to treat hyperparathyroidism, calcium deficiency (hypocalcemia), and calcium deficiency in people with hypoparathyroidism caused by surgery, disease, or other conditions. Calcitriol description, DRUGS.COM, https://www.drugs.com/mtm/calcitriol.html (last visited September 20, 2017).

[4] Levothyroxine is used to treat hypothyroidism and goiter (enlarged thyroid gland) that can result from hormone imbalances, radiation treatment, surgery, or cancer. Levothyroxine

physician, on November 8, 2013, and Dr. Richardson noted that the plaintiff was doing well at home and that since the plaintiff's last visit, where the plaintiff's left vocal cord was paralyzed, the left vocal cord had begun to move. (Tr. 322). On November 22, 2013, Dr. Richardson saw the plaintiff again and noted that only one of her vocal cords was mobile and that the plaintiff was experiencing general pains in her left shoulder, which Dr. Richardson attributed to cranial nerve 11 weakness. (Tr. 316). Dr. Richardson noted on February 21, 2014, that the plaintiff continued to experience vague general pains in her left shoulder, which, again, was attributed to cranial nerve 11 weakness. (Tr. 474).

The plaintiff had her annual well-woman exam on March 6, 2014, and it was documented that the plaintiff had denied headaches, shortness of breath, dizziness, or pain anywhere in her body. (Tr. 534). However, on May 14, 2014, it was reported in a follow-up clinic note that the plaintiff was experiencing a lot of pain, primarily in her neck. (Tr. 539). In yet another follow-up clinical note, written on August 21, 2014, the plaintiff reported that she no longer had facial pain, but did continue to have neck pain and hot flashes. (Tr. 548). As of December 4, 2014, the facial pain had started again. (Tr. 566).

On April 18, 2014, the plaintiff saw Dr. A. Manzano, an endocrine fellow, and Dr. A. Kargi, the attending physician. (Tr. 473). The plaintiff was told that she would be undergoing RAI therapy,[5]

_____

description, DRUGS.COM, https://www.drugs.com/levothyroxine.html (last visited September 20, 2017).

[5] AMERICAN CANCER SOCIETY, *Radioactive Iodine (Radioiodine) Therapy for Thyroid Cancer*, (last revised April 15, 2016) (RAI therapy concentrates in thyroid cells and the radiation can destroy the thyroid gland and other thyroid cells, including cancer cells, that take up iodine without much effect on the rest of the body and can be used to destroy any thyroid tissue that has not been removed by surgery or to treat some forms of thyroid cancer that has spread to lymph nodes or other parts of the body) (last visited September 20, 2017).

that she should take Ibuprofen for pain, and continue taking the Levothyroxine. (*Id.*). One year later, on April 9, 2015, the plaintiff visited the endocrinology clinic and reported that she experienced hot flashes, her voice had changed since the surgery, she had palpitations two to three days per week, and had pain in the left side of her neck at the site of radial neck dissection. (Tr. 513).

B.     Psychiatric Treatment

The plaintiff met with Dr. Fernando Mendez-Villamil for an initial psychiatric evaluation on February 8, 2014, and was seen for fifty minutes. (Tr. 595). The plaintiff stated that her reason for going to Dr. Mendez-Villamil was that she was "very depressed." (*Id.*). During the plaintiff's initial psychiatric evaluation, Dr. Mendez-Villamil noted that the plaintiff explained that she was in a depressed mood, suffered from insomnia, had poor motivation and concentration, had poor energy, and felt hopeless and helpless. (*Id.*) Dr. Mendez-Villamil observed that the plaintiff was anxious and recorded a Global Assessment of Functioning (GAF) score of 40,[6] as well as prescribing fluoxetine[7] and hydroxyzine[8] for anxiety and depression. (Tr. 596). After this initial visit, the plaintiff visited

---

[6] The GAF scale, which ranges from 0-100, is used to help mental health providers determine how serious mental illness may be and to help understand how well a person is able to complete everyday activities. The 31-40 range describes an individual with some impairment in reality testing or communication OR major impairment in several areas, including work or school, family relations, judgment, thinking, or mood. The 41-50 range describes an individual with serious symptoms, such as suicidal ideation or severe obsessional rituals OR any serious impairment in social, occupational, or school functioning. *What Is the Global Assessment of Functioning (GAF) Scale?*, WEBMD.COM, http://www.webmd.com/mental-health/gaf-scale-facts (last visited September 20, 2017).

[7] Fluoxetine is used to treat major depressive disorder and panic disorder. Fluoxetine description, DRUGS.COM, https://www.drugs.com/fluoxetine.html (last visited September 20, 2017).

[8] Hydroxyzine is a sedative used to treat anxiety and tension. Hydroxyzine description, Drugs.com, https://www.drugs.com/hydroxyzine.html (last visited September 20, 2017).

with Dr. Mendez-Villamil every one to five months. (Tr. 583-96). GAF scores were assigned to the plaintiff upon each meeting with Dr. Mendez-Villamil and the scores ranged from 35-48. (*Id.*). Other than the initial visit, all of the plaintiff's visits with Dr. Mendez-Villamil lasted fifteen minutes, and more than 50% of that time was spent providing counseling and/or coordination of care. (*Id.*). Dr. Mendez-Villamil consistently indicated that the plaintiff is unable to care for herself. (Tr. 583-94).

On July 15, 2015, Dr. Mendez-Villamil completed a medical source statement. (Tr. 598-608). Dr. Mendez-Villamil noted that the plaintiff had a "mood disorder (multiple medical problems)," had impairments that lasted, or are expected to last, for a continuous period not less than twelve months, was estimated to miss work more than four days a month due to having "good days" and "bad days," was expected to be off task more than 50% of an 8-hour work day, and that "due to her poor energy and poor concentration, [the plaintiff was] unable to work at all." (Tr. 598-99). Dr. Mendez-Villamil also noted that the plaintiff would have difficulty in making occupational adjustments, making performance adjustments, and making personal-social adjustments. (Tr. 600-01). Additionally, Dr. Mendez-Villamil opined that the plaintiff had marked restriction of activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, and repeated episodes of decompensation, each with an extended duration, as well as a residual disease process that has resulted in a marginal adjustment such that even a minimal increase in mental demands or change in the environment likely would cause the plaintiff to further decompensate. (Tr. 605).

### III. Disability Determination Services

On October 25, 2013, a single decision maker for the Disability Determination Services ("DDS"), Marcia Mandel, noted that after the plaintiff was discharged following the surgery, "she

was doing well . . . with good pain management." (Tr. 90). Ms. Mandel determined that the plaintiff was not disabled pursuant to the Social Security Act. (Tr. 88-93). The plaintiff filed for reconsideration of her disability by the DDS on November 25, 2013, alleging that her voice had gotten worse, and balls had developed in her breasts. On December 18, 2013, Dr. Edmund Molis, MD, a DDS medical consultant, opined that "the [medically determinable impairment(s)] is not, or will not be, or was not, of such severity so as to prevent, or to have prevented, the individual from engaging in [substantial gainful activity] within twelve months after onset." (Tr. 95-101).

## IV. Vocational Expert's Testimony

At the hearing, the vocational expert ("VE"), Ronald Malik, testified before the ALJ. (Tr.80-83). The VE testified that there was work in the region for the plaintiff based on the following hypothetical question posed by the ALJ: "hypothetical individual in the age range of [the plaintiff,] educated at a seventh grade level, no past work. Limited to light exertion, unskilled work, and only occasional contact with the general public." (Tr. 81-82). The jobs that the plaintiff can perform, according to the VE, include a polisher, a kitchen helper, and an offbearer. (*Id.*). Thereafter, the VE was asked multiple questions about the unskilled job market in Florida. (Tr. 82-83). The questions pertaining to the unskilled job market were in regard to employers' tolerance of unscheduled leave and the percentage of a workday that an unskilled worker would need to be on task. (Tr. 82-83). The VE testified that for the types of jobs he listed as answers to the ALJ's hypothetical, employers won't tolerate more than thirteen unscheduled call-ins per year and that the individual would need to be on task eighty-five percent of the day or better. (Tr. 82).

The VE was then examined by the plaintiff's attorney. (Tr. 83-86). Taking the hypothetical posed by the ALJ, the attorney added on restrictions pertaining to the use of hands. (Tr. 85-86). The

VE testified that his answer would remain the same as his answer to the original hypothetical posed by the ALJ. (Tr. 86).

## ALJ'S DECISION MAKING PROCESS

"Disability" is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can last for a continuous period of not less than twelve months . . . ." 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505 (2017).[9] The impairment(s) must be severe, making the plaintiff "unable to do his previous work . . . or any kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

To determine whether the plaintiff is entitled to disability benefits, the ALJ must apply a five-step analysis. 20 C.F.R. § 404.1520(a)-(f). The ALJ must first determine whether the plaintiff is presently employed or engaging in substantial gainful activity. 20 C.F.R § 404.1520(a)(4)(I). If so, a finding of non-disability is made and the inquiry ends. *Id.*.

Second, the ALJ must determine whether the plaintiff suffers from a severe impairment or a combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). If the plaintiff does not, then a finding of non-disability is made and the inquiry ends. *Id.*.

Third, the ALJ compares the plaintiff's severe impairments to those in the listings of impairments located in Appendix 1 to Subpart 404 of the Code of Federal Regulations. 20 C.F.R. 404.1520(a)(4)(iii); 20 C.F.R. Pt. 404, Subpt. P, App. 1. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that if such impairments are established, the regulation requires a finding of disability without further inquiry into the plaintiff's ability to

---

[9] All references to the Code of Federal Regulations are to the 2017 edition.

perform other work. *See Gibson v. Heckler*, 762 F.2d 1517, 1518 n.2 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed, and benefits are awarded. 20 C.F.R. § 404.1520(d).

Fourth, the ALJ must determine whether the plaintiff has the "residual functional capacity" to perform his or her past relevant work. "Residual Functional Capacity" ("RFC") is defined as "the most you can still do despite your limitations." 20 C.F.R. § 404.1545(a)(1). This determination takes into account "all relevant evidence," including medical evidence, the claimant's own testimony, and the observations of others. 20 C.F.R. § 404.1545(a)(3). If the plaintiff is unable to perform his or her past relevant work, then a prima facie case of disability is established and the burden of proof shifts to the Commissioner to show at the fifth step where there is other work available in the national economy which the plaintiff can perform. 20 C.F.R. § 404.1520(e)-(g); *see Barnes v. Sullivan*, 932 F.2d 1357, 1359 (11th Cir. 1991) (holding that the claimant has the initial burden of proving that she is unable to perform previous work).

Fifth, if the plaintiff cannot perform his or her past relevant work, the ALJ must decide if the plaintiff is capable of performing any other work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). The ALJ considers the assessment of the RFC, age, education, and work experience of the plaintiff to determine if the plaintiff can make an adjustment to other work. *Id.*. No disability will be found where the plaintiff can adjust to other work, but disability will be found if the plaintiff is unable to adjust to other work. *Id.*.

## ALJ'S FINDINGS

At step one, the ALJ determined that the plaintiff had not engaged in substantial gainful activity since October 6, 2013, the application date. 20 C.F.R. § 416.971. (Tr. 34).

At step two, the ALJ determined that the plaintiff has severe anxiety and depression impairments. 20 C.F.R. § 416.920(c). (*Id.*). The ALJ found these impairments "[impose] at least more-than-minimal limitations on the claimant's ability to perform basic work-related activities for at least twelve consecutive months." (*Id.*). The ALJ also noted that the plaintiff had been diagnosed with thyroid cancer and hypocalcemia, but no substantial evidence existed that showed that these impairments "have imposed more-than-minimal limitations on the claimant's ability to perform basic work-related activities for at least twelve consecutive months." (*Id.*).

At step three, the ALJ found that the plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926)." (Tr. 35). The ALJ found that the plaintiff's mental impairments, "considered singly and in combination, do not meet or medically equal the criteria" pursuant to listings 12.04 and 12.06.[10] (*Id.*).

In the decision, the ALJ assessed whether the "paragraph B" criteria were satisfied by the severity of the plaintiff's mental impairments. (*Id.*). In order to satisfy the "paragraph B" criteria, "mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration."[11] (*Id.*). The ALJ then noted that the plaintiff has mild restriction on activities of daily living. (*Id.*). The ALJ based this finding on the plaintiff's testimony that she is able to prepare meals

---

[10] 20 C.F.R. Pt. 404, Subpt. P, App. 1 (listing 12.04 refers to affective disorders, while listing 12.06 refers to somatoform disorders).

[11] "A marked limitation means more than moderate but less than extreme." (Tr. 35).

and wash dishes, fold clothes (but doesn't do the laundry), can sometimes dress herself, can take a shower without help, occasionally goes shopping with her husband, but that her psychological conditions make her not want to do any activities. (*Id.*). With regard to social functioning, the ALJ found that the plaintiff has moderate difficulties. (Tr. 35). The ALJ again based his finding on the plaintiff's testimony that she lives with her husband and interacts with him on a daily basis, sometimes has family members visiting her at home, sees other people when she goes to the supermarket with her husband, but that she also did not like to leave the house very often. (*Id.*). Next, regarding the plaintiff's concentration, persistence, or pace, the ALJ found that the plaintiff had mild difficulties. (*Id.*). The ALJ, relying on the plaintiff's testimony, found that even though the plaintiff noted that she has difficulties in concentrating, she testified that she was able to hold conversations with her doctor during meetings and, further, the plaintiff was unable to provide any examples of her difficulties with concentration. (*Id.*). Finally, regarding decompensation, the ALJ found that there was nothing in the record to support the notion that the plaintiff had experienced any episodes of decompensation, which have been of extended duration. (*Id.*). The ALJ noted that he found there was no decompensation because the record did not indicate that the plaintiff required any significant alteration of medication during any period of her mental impairment, showed no need for a more structured psychological support system, and showed no other times of increased severity of the plaintiff's mental impairments. (*Id.*).

The ALJ found that the plaintiff's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation of extended duration and, therefore, the "paragraph B" criteria were not met. (Tr. 36). The ALJ then considered whether the "paragraph C" criteria were satisfied, but found that the plaintiff failed to establish the

presence of "paragraph C" criteria. (*Id.*).

At step four, the ALJ determined the plaintiff "has the residual functional capacity to perform light work as defined in 20 C.F.R. 416.967(b) except that she can only perform unskilled work and she can only have occasional contact with the general public." (*Id.*). The ALJ contends that he considered all symptoms and the extent to which they could reasonably be accepted as consistent with objective medical evidence and other evidence. (*Id.*). In making his determination, the ALJ conducted a two-step analysis. First, the ALJ had to determine whether there was any underlying medically determinable physical or mental impairment(s), i.e., "an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques," that could reasonably be expected to produce the plaintiff's pain or other symptoms. (*Id.*). Second, if an underlying impairment(s) that could reasonably be expected to cause the plaintiff's pain or other symptoms is shown, an evaluation of the intensity, persistence, and limiting effects of the symptom(s) is made to determine the extent to which they limit the plaintiff's functioning. (*Id.*). The ALJ noted that where statements pertaining to the intensity, persistence, and limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements on consideration of the entire case record. (Tr. 36).

The ALJ found that the plaintiff did have medically determinable impairments that could reasonably be expected to cause the alleged symptoms–i.e., poor neck rotation, compromised vocal cords, numbness, difficulty standing, difficulty lifting and carrying, and adverse side effects due to medication–but "the [plaintiff's] statements pertaining to the intensity, persistence and limiting effects of those symptoms are not entirely credible . . . ." (Tr. 37).

The ALJ acknowledged the plaintiff's history of both thyroid cancer and hypocalcemia. (Tr.

14

37-38). The ALJ found support for the plaintiff's allegations of thyroid cancer in the medical evidence of record and determined that while the plaintiff may have gone through a brief period of limitation following the surgery, the plaintiff has been in remission since September 2013. (Tr. 37-38). Furthermore, the ALJ determined that although the plaintiff was still exhibiting vocal cord impairments, those impairments were consistent with limiting the plaintiff to no more than general interaction with the general public. (Tr. 38). The ALJ also found support in the medical evidence of record for the plaintiff's allegations of hypocalcemia and related symptoms. (*Id.*). However, after analyzing the evidence, the ALJ determined that other than some cramping following the surgery, there was nothing in the record to suggest that there were symptoms related to the plaintiff's hypocalcemia that were inconsistent with the plaintiff's ability to perform work at the light exertional level. (*Id.*).

The ALJ also noted that the medical evidence of record does provide some support for the plaintiff's allegations of limitations due to her anxiety and depression, and the plaintiff's anxiety and depression "conceivably cause limitations to her ability to perform mental work activities." (*Id.*).

The ALJ gave no weight to the DDS single decision maker, little weight to the plaintiff's treating psychiatrist, and great weight to the DDS medical consultant. (Tr. 39).

The ALJ gave no weight to the DDS single decision maker because "the single decision maker has no expert knowledge about the [plaintiff's] alleged impairments." (*Id.*). The ALJ also considered the plaintiff's allegations as to her physical and mental impairments, and determined that those allegations were not entirely credible because at the hearing, the plaintiff's testimony was "sparse and often contradictory." (*Id.*). For example, the plaintiff noted that "she is sick and unable to work, but she gave very few specifics to her impairments and limitations." (*Id.*). Moreover, the

plaintiff indicated that she "sees her psychiatrist once a month for an hour at a time," but the treatment notes provided by the treating psychiatrist indicate that the meetings were "only 15-minute medication management visits." (*Id.*). The ALJ noted that the inconsistencies detract from the overall credibility of the plaintiff's allegations of impairments and limitations. (*Id.*).

Great weight was given the to the DDS medical consultant because "[his opinion] is consistent with the medical evidence of record." (*Id.*). The ALJ opined that the plaintiff's history of thyroid cancer and her subsequent treatment was indicative of a brief period of limitation, but she has been in remission since September 2013 and shows no evidence of a tumor. (Tr. 38). The ALJ proceeded to determine that the plaintiff's status post-thyroid cancer is "consistent with the light exertional level in the [plaintiff's] residual functional capacity [and] the vocal cord impairments that the [plaintiff] has exhibited since her surgery are consistent with the limitation" of only occasional interaction with the general public. (*Id.*). As for the plaintiff's history of hypocalcemia, the ALJ found that while the plaintiff did have some minimal related symptoms, the hypocalcemia was also consistent with the ability to perform work at the light exertional level. (*Id.*).

Finally, the ALJ gave little weight to the plaintiff's treating psychiatrist because the treating psychiatrist's treatment notes, which were made every one to five months during the plaintiff's visits, and the GAF scores assigned at each of those visits, "indicate that Dr. Mendez-Villamil opined that the [plaintiff] exhibited between major impairment in several areas of functioning (GAF 31-40) to moderate symptoms or moderate difficulty in social, occupational, or school functioning (GAF 51-60)." (Tr. 39). The ALJ noted that Dr. Mendez-Villamil "rendered [his] opinions [pertaining to the plaintiff's functional abilities] after only speaking with the claimant for fifteen minutes at a time and [his] opinions were not consistent with [his] own treatment notes at those visits." (*Id.*).

The ALJ also noted that Dr. Mendez-Villamil's psychiatric evaluation, completed on July 9, 2015, opined that the plaintiff "would be absent from work more than four times a month due to her impairments, would likely be off-task more than 50% of the workday, and could not work on a full-time basis." (Tr. 39-40). However, the ALJ gave little weight to the psychiatric evaluation because even though the treating psychiatrist treated the plaintiff's mental impairments for over a year, "most of his interactions with the [plaintiff] were simply 15-minute visits to prescribe additional medication . . . [and] never noted symptoms at the severity described in his July 2015 psychiatric evaluation." (Tr. 40).

The ALJ ultimately found that the RFC assessment that he made was supported by the plaintiff's written and oral testimony, the objective medical evidence, and the opinions given by medical experts. Additionally, the ALJ specifically noted inconsistencies in the plaintiff's oral and written testimony, such as alleging that she claims she does not do anything during the day, but then admitted to doing chores around the house or that she reported that she doesn't leave the house, but then stated that she sometimes goes shopping with her husband. (Tr. 39). Accordingly, the ALJ rendered the plaintiff capable of performing work at the light exertional level with additional mental limitations. (Tr. 40).

At step five, the ALJ determined that, pursuant to 20 C.F.R. § 416.965, the plaintiff is unable to perform any past relevant work, but under the plaintiff's "current residual functional capacity," can perform only light and unskilled work. (*Id.*). Based on the VE's testimony, which the ALJ found to be consistent with the information contained in the Dictionary of Occupational Titles, the ALJ, considering the plaintiff's age, education, work experience, and residual functional capacity, determined that the plaintiff "is capable of making a successful adjustment to other work that exists

in significant numbers in the national economy." (Tr. 41).

## STANDARD OF REVIEW

The Court must determine whether it is appropriate to grant either party's motion for summary judgment. Judicial review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *see Wolfe v. Chater*, 86 F.3d 1072, 1076 (11th Cir. 1996) (holding the reviewing court should not re-weigh evidence or substitute their discretion). On judicial review, decisions made by the defendant (the Commissioner of Social Security) are conclusive if supported by substantial evidence and if the correct legal standard was applied. 42 U.S.C. § 405(g); *see Kelley v. Apfel*, 185 F.3d 1211, 1213 (11th Cir. 1999). Eleventh Circuit Courts have determined that "substantial evidence" is more than a scintilla, but less than a preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as adequate to support a conclusion. *See Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). In determining whether substantial evidence exists, "the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).

The restrictive standard of review, however, applies only to findings of fact; no presumption of validity attaches to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. *Cornelius v. Sullivan*, 936 F.2d 1143, 1143-46 (11th Cir. 1991) (holding "[Commissioner]'s failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal."); *accord Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).

The reviewing court must be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. *See Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). The court may not, however, decide the facts anew, re-weigh evidence, or substitute its judgment for that of the ALJ, and even if the evidence weighs against the Commissioner's decision, the reviewing court must affirm if the decision is supported by substantial evidence. *See Miles*, 84 F.3d at 1400; *see also Baker v. Sullivan*, 880 F.2d 319, 321 (11th Cir. 1989). Factual evidence is presumed valid, but the legal standard applied is not. *See Martin*, 894 F.2d at 1529. The Commissioner must apply the correct legal standard with sufficient reasoning to avoid reversal. *Id.*.

## LEGAL ANALYSIS

The plaintiff challenged the ALJ's decision of September 2, 2015, asserting that the Commissioner's decision is not based on substantial evidence and contains errors of law. (DE #21 at 4). The plaintiff raises seven issues for consideration: 1) the ALJ failed to properly consider all of the evidence and fully and fairly develop the record; 2) the ALJ improperly discounted the opinions of the plaintiff's treating psychiatrist; 3) the ALJ failed to properly consider the effects of the plaintiff's surgery; 4) the ALJ's RFC assessment is not supported by substantial evidence or by either a treating or examining medical source; 5) the ALJ failed to consider the side-effects of plaintiff's medication; 6) disability is established based on the testimony of the vocational expert; and 7) the ALJ's credibility analysis was not properly documented or conducted at the appropriate time. (DE #21 at 5-18; DE #26 at 3-10). As more fully described below, the undersigned finds that the ALJ erred with respect to the weight he assigned to the plaintiff's treating psychiatrist.

## I. The ALJ Failed to Properly Consider the Treating Psychiatrist's Opinion

The plaintiff argues that the relevant evidence pertinent to the plaintiff's claim of mental

impairments is provided solely by the treating psychiatrist, the ALJ did not articulate any actual or contemporaneous inconsistencies, and the ALJ did not properly consider the treatment notes of Dr. Mendez-Villamil. (DE #21 at 9-10). Ordinarily, the treating physician's opinion is entitled to substantial or considerable weight. *See* 20 C.F.R. § 404.1527(d)(2); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986) (citing *Broughton v. Heckler*, 776 F.2d 960, 961-62 (11th Cir. 1985). The medical opinions[12] of one-time examiners are not entitled to deference or great weight. *See Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004). The ALJ must accord a treating source opinion controlling weight where it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Roth v. Astrue*, 249 F. App'x. 167, 168 (11th Cir. 2007). However, the opinion of a treating source may be given less weight in circumstances when the evidence supports a contrary finding or does not support the opinion given by the source. 20 C.F.R. § 416.927; *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991). The ALJ may discount a treating source's opinion when "good cause exists for not heeding the treating physician's diagnosis." *Edwards*, 937 F.2d at 583. When controlling weight is not accorded to the treating source opinion, the ALJ must consider the physician's specialization, the length of the treatment relationship, the nature and frequency of examinations, the evidence offered in support of the opinion, and the consistency of that opinion with the record as a whole. 20 C.F.R. § 416.927(c);

---

[12] "Medical opinions are statements from physicians and psychologists . . . that reflect judgments about the nature and severity of [the plaintiff's] impairment(s) including [the plaintiff's] symptoms, diagnosis and prognosis, what [the plaintiff] can still do despite impairment(s), and [the plaintiff's] physical or mental restrictions." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178-79 (11th Cir. 2011) (quoting 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)).

*Schuhardt v. Atrue*, 303 F. App's. 757, 759 (11th Cir. 2008). Additionally, the ALJ must "state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2006) (citing *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)).

The ALJ considered and gave little weight to the opinion of the plaintiff's treating psychiatrist. (Tr. 39-40). The plaintiff argues that the ALJ discounted the treating psychiatrist's opinion without an adequate basis for doing so. (DE #21 at 8). The ALJ, in discounting the medical opinion of Dr. Mendez-Villamil explained that

> between February 2014 and July 2015, the claimant attended 15-minute medication management visits with Dr. Mendez-Villamil, every one to five months. Dr. Mendez-Villamil assigned the claimant a global assessment of functioning (GAF) score of 40 in February 2014, 60 in March 2014, 40 in April 2014, 35 in September 2014, 48 in October 2014, 60 in March 2015, 48 in June 201[5], and 45 in July 2015. These scores indicate that the Dr. Mendez-Villamil opined that the claimant exhibited between major impairment in several areas of functioning (GAF of 31-40) to moderate symptoms or moderate difficulty in social, occupational, or school functioning (GAF of 51-60). The undersigned gives these opinions little weight because Dr. Mendez-Villamil rendered these opinions after only speaking with the claimant for 15 minutes at a time and these opinions are not consistent with Dr. Mendez-Villamil's own treatment notes at those visits.
> . . .
> Although Dr. Mendez-Villamil treated the claimant's mental impairments for over a year, most of his interactions with the claimant were simply 15-minute visits to prescribe additional medication. In his treatment notes, Dr. Mendez-Villamil never noted symptoms at the severity described in his July 2015 psychiatric evaluation notes. Because Dr. Mendez-Villamil's opinion has no basis in his own treatment notes, the undersigned finds that it is very unreliable.

(Tr. 39-40) (citations omitted).

"Good cause exists under these circumstances: (1) the treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *David-O'Brien v.*

21

*Astrue*, 415 F. App'x. 137, 139 (11th Cir. 2011); *see also Wind v. Barnhart*, 133 F. App'x. 684, 691 (11th Cir. 2005) ("Good cause to discredit a treating physician's opinion on disability or inability to work exists where the doctor's opinion is not supported by the evidence, is inconsistent with the physician's own medical records, or merely is conclusory."). A review of the record and the ALJ's decision demonstrates that the ALJ's choice to afford Dr. Mendez-Villamil's opinion little weight is not supported by good cause.

There is evidence in the record that supports the opinion of Dr. Mendez-Villamil. The plaintiff began seeing Dr. Mendez-Villamil in February 2014, reporting that she was feeling "very depressed." (Tr. 595). At this initial visit, Dr. Mendez-Villamil saw the plaintiff for fifty minutes and prescribed her fluoxetine and hydroxyzine for anxiety and depression. (Tr. 596). After the initial visit, the plaintiff visited Dr. Mendez-Villamil every one to five months and would be seen for fifteen minutes at a time. (Tr. 583-96). The ALJ opined that these visits were simply for medication management. (Tr. 40). However, according to Dr. Mendez-Villamil's treatment notes, more than 50% of the plaintiff's visits with the doctor were spent face-to-face so that Dr. Mendez-Villamil could provide counseling, including the need for continued treatment and discussing compliance with treatment risks and benefits of treatment, and/or coordination of care. (Tr. 583-92). On each of the plaintiff's visits between April 30, 2014, and July 2, 2015, Dr. Mendez-Villamil's treatment notes consistently indicated that the plaintiff is unable to care for herself, has poor memory, poor concentration, slowed speech, and retarded psychomotor activity and that other than on March 4, 2014, and March 21, 2015, where the plaintiff exhibited GAF scores of 60, the plaintiff's GAF scores ranged from 35-48. (Tr. 583-96). Dr. Mendez-Villamil also noted that the plaintiff's thought process fluctuated between impoverished and coherent. (*Id.*).

22

On July 9, 2015, Dr. Mendez-Villamil completed a medical source opinion in which he noted that the plaintiff has marked restrictions on activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, and repeated episodes of decpompensation, each of extended duration. (Tr. 605). Dr. Mendez-Villamil also opined that the plaintiff would have difficulty in making occupational adjustments, performance adjustments, and personal-social adjustments. (Tr. 600-01).

The defendant argues that a treating physician's opinion may be discounted when there is good cause to do so, such as the opinion being conclusory, the doctor failing to provide objective medical evidence to support his or her opinion, the opinion given is inconsistent with the record as a whole, or the evidence supports a contrary finding. (DE #22 at 13). However, medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairments, including a claimant's symptoms, diagnosis, and prognosis; what the claimant can still do despite her impairments; and the claimant's physical or mental restrictions. *Winchel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178-79 (11th Cir. 2011). Procedurally, the ALJ must articulate "the weight given to different medical opinions and the reasons therefor." *Id.* at 1179.

The ALJ gave little weight to the opinion of Dr. Mendez-Villamil because "Dr. Mendez-Villamil rendered these opinions after only speaking with the claimant for 15 minutes at a time and these opinions are not consistent with Dr. Mendez-Villamil's own treatment notes at those visits." (Tr. 39). The undersigned finds that the ALJ failed to properly weigh the medical opinions in the record. The July 9, 2015, psychiatric evaluation by Dr. Mendez-Villamil marks at least two of the "Paragraph B" criteria, finding marked difficulties in maintaining social interactions and concentration, persistence, or pace. 20 C.F.R. § Pt. 404, Subpt. P, App. 1 (section 12.04); (Tr. 605).

The opinions from medical sources, particularly from treating medical sources, are critically important when determining a claimant's RFC. *See Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987). The regulations imposed upon the Commissioner establish that if a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques, and it is consistent with other substantial evidence, the ALJ must give it controlling weight. *See* 20 C.F.R. § 416.927(c)(2). A review of the ALJ's decision demonstrates that the ALJ's choice to afford Dr. Mendez-Villamil's (the treating psychiatrist) opinion little weight is not adequately supported by the record. Dr. Mendez-Villamil specializes in psychiatry, treated the plaintiff over a period of eighteen months, from February 8, 2014, to July 2, 2015, and made consistent findings as to the plaintiff's mental health. *See* 20 C.F.R. § 416.927(c)(2)-(3); (Tr. 583-96).

The ALJ gave great weight to the DDS medical consultant, Dr. Edmund Molis, because his opinion that "the claimant's medical conditions were not severe" was consistent with the medical evidence in the record. (Tr. 39). Dr. Molis, however, offered no opinion on the plaintiff's mental impairments. (Tr. 95-100). Furthermore, Dr. Molis did not perform an examination of the plaintiff, and merely made a report based on his files. (*Id.*). Opinions from non-examining consultants are generally entitled to the least weight of any medical source. *See* 20 C.F.R. § 416.927(c)(1). The Eleventh Circuit has also downplayed the value that these types of reports provide. *See Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988). Reliance on the non-examining consultant was particularly misplaced in this case. Dr. Edmund Molis reviewed the file on December 18, 2013, prior to the onset date of the plaintiff's mental impairments. (Tr. 95-100, 595). The consultant did not review any evidence relevant to the period at issue, nor could he have done so, as the plaintiff did

not begin treatment for her mental impairments until February 8, 2014. Accordingly, the ALJ erred by not showing good cause for rejecting Dr. Mendez-Villamil's opinion.

## II. The ALJ Fully and Fairly Developed the Record

The plaintiff argues that both the ALJ and the Appeals Council failed to develop the record fully and fairly by not considering the full extent of the physical and mental impairments alleged by the plaintiff, as well as failing to consider and discuss all relevant evidence. (DE #21 at 5). The plaintiff further contends that "the ALJ was obligated to order further physical examination, with a functional assessment, in order to make an informed decision" as to the plaintiff's physical impairments. (*Id.* at 7). Finally, the plaintiff argues that because the ALJ "reject[ed] the existing evidence and applicable medical opinions" provided by the plaintiff's treating psychiatrist, "the ALJ must order additional consultative cognitive testing and functional evaluation" to properly determine the plaintiff's abilities. (*Id.* at 8).

An ALJ has a basic obligation to develop the record fully and fairly. *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981). In order to fully and fairly develop the record, the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts." *Henry v. Commissioner of Social Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015) (citing *Cowart*, 662 F.2d at 735). The ALJ has a duty to "investigate the facts and develop the arguments both for and against benefits." *Sims v. Apfel*, 530 U.S. 103, 111 (2000) (citing *Richardson v. Perales*, 402 U.S. 389, 400-01 (1971)). Additionally,

> [c]onsultative examinations are not required by statute, but the regulations provide for them where warranted. The secretary's regulations tell claimants: 'If your medical sources cannot give us medical evidence about your impairment for us to determine whether you are disabled . . . we may ask you to take part in physical or mental examinations or tests.' 20 C.F.R. § 416.917.

*Smith v. Bowen*, 792 F.2d 1547, 1551 (11th Cir. 1986).

"It is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision." *Reeves v. Heckler*, 734 F.2d 519 at n.1 (11th Cir. 1984) (citing to *Ford v. Sec'y of Health and Human Serv.'s*, 659 F.2d 66, 69 (5th Cir. 1981) (Unit B)). Where "no other physician recommended an additional consultation, and the record [is] sufficiently developed for the ALJ to make a determination," the ALJ is not required to order a consultative evaluation. *Good v. Astrue*, 240 F. App'x 399, 404 (11th Cir. 2007).

The ALJ must consider the evidence as a whole and remand for further development of the record "is appropriate where 'the record reveals evidentiary gaps which result in unfairness or clear prejudice.'" *Henry*, 802 F.3d at 1267 (citing *Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir. 1995). The plaintiff also "bears the burden of proving that [she] is disabled, and, consequently, [she] is responsible for producing evidence in support of [her] claim. *See* 20 C.F.R. § 416.912(a) (stating that '[claimant] must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s)' . . . ." *Ellison v. Barnhart*, 355 F.3d 1272 (11th Cir. 2003)).

In this matter, the ALJ sufficiently developed the record and did not err by not ordering a physical consultative evaluation, nor did the ALJ err by not ordering a psychiatric and/or psychological consultative examination. The ALJ had substantial evidence, such as the plaintiff's testimony and medical records pertaining to the surgery, (Tr. 55-56 , 235, 342), and doctors' notes indicating the plaintiff's improvement following surgery, (Tr. 316, 322, 534), to conclude that the plaintiff's thyroid cancer and hypocalcemia have not "imposed more-than-minimal limitations on the claimant's ability to perform basic work-related activities for at least twelve consecutive months." (Tr. 34). Additionally, the ALJ had access to the medical source statement written by the

plaintiff's treating psychiatrist when rendering his decision that the plaintiff's mental impairments, "considered singly and in combination, do not meet or medically equal the criteria" pursuant to listing 12.04 and 12.06, (Tr. 35), but the ALJ did not properly weigh Dr. Mendez-Villamil's opinion.

As stated in *Smith v. Bowen*, "[i]f [the plaintiff's] medical sources cannot give us medical evidence about your impairment for us to determine whether [the plaintiff is] disabled . . . we may ask you to take part in physical or mental examinations or tests." 20 C.F.R. § 416.917; 792 F.2d at 1551. In this case, the plaintiff's medical sources do provide substantial evidence to show that the ALJ had fully developed the record. The ALJ's decision to discount a treating doctor's opinion does not impose an obligation on the ALJ to order a consultative examination. *Ybarra v. Comm'r of Soc. Sec.*, 658 F. App'x 538, 543 (11th Cir. 2016). Moreover, the record does not reveal another "physician recommend[ing] an additional consultation . . . ." *Good*, F. App'x at 404.

The record extensively details the plaintiff's progress as she was recovering following her surgery. While there is evidence that the plaintiff still suffers from both physical and mental impairments, the ALJ had "all of the relevant evidence before him in the record," and the record does not exemplify a "showing of prejudice" that must be shown to constitute reversible error. *Townsend v. Comm'r of Soc. Sec.*, 2014 WL 481127 at *2. The undersigned finds that the ALJ developed the record sufficiently for him to "make an informed decision". *Reeves v. Heckler*, 734 F.2d 519 at n.1 (1984) (citing to *Ford v. Sec'y of Health and Human Serv.'s*, 59 F.2d 66, 69 (5th Cir. 1981) (Unit B)). However, because the ALJ did not properly weigh the opinion of Dr. Mendez-Villamil, the record was not properly considered.

### III. Effects of Plaintiff's Surgery

An impairment is not severe if it does not significantly limit a claimant's physical ability to

do basic work activities. 20 C.F.R. § 416.922(a). Here, the ALJ noted that the plaintiff's thyroid cancer and hypocalcemia were medically determinable impairments but neither inhibited the plaintiff's ability to perform work at the light exertional level. (Tr. 37-38). In reaching his decision, the ALJ relied on the medical evidence of record, the plaintiff's testimony, opinion evidence, and documents produced by various medical professionals. (Tr. 35-40).

The plaintiff argues that the ALJ never accounted for information pertaining to the plaintiff's activities of daily living, namely nerve damage that was a result of the surgery. (DE #21 at 12). The ALJ noted that the plaintiff testified that she could prepare meals with the help of her husband and could sometimes perform household chores. (Tr. 37, 67). The plaintiff had complained of vague general pains in her left shoulder in the past, but her treating physician had attributed the pain to cranial nerve 11 weakness. (Tr. 38, 316, 474).

The plaintiff's description of her daily life, as well as medical and treatment records collected prior to the ALJ's hearing, provided ample evidence to substantiate that the ALJ fully considered the effects of plaintiff's surgery. The ALJ considered medical evidence pertaining to nerve damage, (Tr. 38, 316, 474), as well as symptoms that could reasonably be expected to cause the plaintiff's alleged symptoms, such as the progression of the plaintiff's vocal cords following the surgery. (Tr. 38, 322). Insofar as the ALJ was required to look at objective medical evidence, the undersigned finds that ample reasoning and explanation support the ALJ's consideration of the effects of plaintiff's surgery.

## IV. RFC Assessment

The plaintiff argues that the ALJ's RFC is not supported by substantial evidence or by either a treating or examining medical source. (DE #21 at 13). Furthermore, the plaintiff asserts that the ALJ failed to consider both the physical limitations directly related to the plaintiff's surgery and the

plaintiff's mental impairments. (*Id.* at 14). However, in determining the plaintiff's RFC, the ALJ found that the plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms. (Tr. 37). In making his RFC assessment, the ALJ gave great weight to Dr. Molis, the State agency medical consultant, because the opinion of Dr. Molis was consistent with the medical evidence of record. (Tr. 39). However, as noted above, Dr. Molis did not personally examine the plaintiff, and relied only on files to render his opinion. (Tr. 95-100). Additionally, the ALJ considered the relevant medical evidence pertaining to the plaintiff's mental impairments provided by Dr. Mendez-Villamil, but, as previously discussed, did not properly weigh Dr. Mendez-Villamil's opinion. Accordingly, the undersigned finds that the ALJ did not properly consider the medical evidence of record in making his RFC assessment.

## V. Side Effects of Plaintiff's Medication

The plaintiff argues, pursuant to SSR 96-7p and SSR 96-8p, that the ALJ failed to consider the side effects of her medication. (DE #21 at 16). According to the plaintiff, her side effects include dizziness, drowsiness, palpitations, that she is unable to walk when she takes her pills, and remains sleepy all day. (*Id.*). However, the plaintiff did not cite to any objective medical evidence that she suffered side effects from her medication. Additionally, the ALJ did note the plaintiff's allegation of side effects from her medication and took that into consideration. (Tr. 37). Accordingly, the ALJ's ruling was proper with respect to the medication side effects.

## VI. Disability by Virtue of VE

The plaintiff argues that the VE's testimony establishes that the plaintiff is disabled and relies on Dr. Mendez-Villamil's opinion that the plaintiff would miss more than four days per month and would be off task for more than 50% of the workday. (DE #21 at 17; Tr. 598-99). For the jobs the

VE listed, the VE said that workers would "need to be on task [eighty-five] percent of the day or better." (Tr. 82). Until proper weight is given to Dr. Mendez-Villamil, the undersigned makes no finding as to whether the VE's testimony alone establishes disability.

## VII. ALJ's Credibility Analysis

Lastly, the plaintiff argues that the ALJ improperly analyzed her credibility by not documenting or conducting the analysis at the appropriate time. (DE #21 at 18). However, the ALJ's credibility determination was made throughout the RFC assessment. (Tr. 36-40). The plaintiff asserts that the ALJ failed to consider her subjective complaints, (DE #21 at 18), however, the ALJ specifically notes inconsistencies between the plaintiff's allegations and her testimony at the hearing. (Tr. 39). Accordingly, the ALJ properly conducted his credibility analysis of the plaintiff.

## RULING

In accordance with the foregoing, it is

**ORDERED AND ADJUDGED** that the plaintiff's Motion for Summary Judgment (DE #21, 06/24/2017) is **GRANTED** in part and **DENIED** in part, the defendant's Motion for Summary Judgment (DE #22, 07/24/2017) is **DENIED,** and this matter is remanded to the ALJ for the reasons stated herein.

DONE AND ORDERED at the United States Courthouse, Miami, Florida this 29th day of December, 2017.

JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided to:
All counsel of record